**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────

RYAN MORRISON,

                              Plaintiff,                    1:23-cv-232
                                                           (ECC/ML)
v.

NEW YORK STATE TROOPER
MICHAEL STRAIN, SARATOGA COUNTY
SHERIFF DEPUTY ALEXANDER RONEY
and SARATOGA COUNTY SHERIFF
DEPUTY PAUL PECOR, individually and
in their official capacity,

                              Defendants.

───────────────────────────────────

James C. Knox, Esq., *for Plaintiff*
Corey A. Ruggiero, Esq., *for County Defendants*
Peter A. McDaniel, Asst. Att'y General, *for Defendant Strain*

**Hon. Elizabeth C. Coombe, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This action arises from Plaintiff Ryan Morrison's June 17, 2022 arrest by the Defendant

law enforcement officers while responding to a 911 call reporting a domestic dispute.  Plaintiff

brings this action pursuant to 42 U.S.C. § 1983, alleging that the Defendants subjected him to false

arrest and excessive force in violation of his Fourth and Fourteenth Amendment rights.  Complaint

(Compl.), Dkt. No. 1.  Presently before the Court are the parties' motions for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. Nos. 42, 43, 49.  For the

following reasons, Defendants' motions for summary judgment are granted, and Plaintiff's cross-

motion for summary judgment is denied.

## II.    FACTS[1]

At approximately 5:30 p.m. on June 17, 2022, Defendants New York State Trooper Michael Strain (Trooper Strain) and Saratoga County Sheriff Deputy Alexander Roney (Deputy Roney) were dispatched to Plaintiff's apartment in response to a 911 call reporting a physical domestic disturbance.  Pl. Resp. County SUMF ¶¶ 6-7, 75-80; Pl. Resp. Strain SUMF ¶¶ 2-6; Pl. Supp. SUMF ¶ 1.[2]  Upon arrival, Trooper Strain and Deputy Roney entered Plaintiff's apartment building and walked up the interior staircase to Plaintiff's third-floor apartment.  Pl. Resp. County SUMF ¶ 86; Pl. Resp. Strain SUMF ¶ 7.  As they approached Plaintiff's apartment door, Trooper Strain and Deputy Roney heard a baby crying.  Pl. Resp. County SUMF ¶¶ 87, 219; Pl. Resp. Strain SUMF ¶ 8.  Trooper Strain knocked on Plaintiff's apartment door and announced himself as an officer, after which time the baby "went silent."  Pl. Resp. County SUMF ¶¶ 87-88; Pl. Resp. Strain SUMF ¶ 8.  Trooper Strain made a comment to Deputy Roney about the baby no longer crying.  Pl. Supp. SUMF ¶3; BWC at 17:35:20.  Plaintiff only disputes these facts to the extent Defendants claim that the baby stopped crying as a direct result of Trooper Strain announcing himself.  Pl. Resp. County SUMF ¶¶ 89-90; Pl. Resp. Strain SUMF ¶ 8.  Plaintiff does not dispute

---

[1] The facts are drawn from the parties' submissions, including the County Defendants' Statement of Material Facts, Dkt. No. 42-1 (County SUMF); Defendant Strain's Statement of Material Facts, Dkt. No. 43-2 (Strain SUMF), Plaintiff's Responses to the Defendants' Statements of Material Facts, Dkt. No. 49-2 (Pl. Resp. County SUMF), 49-3 (Pl. Resp. Strain SUMF); Plaintiff's Supplemental Statement of Material Facts, Dkt. No. 49-4 (Pl. Supp. SUMF), and the exhibits the parties have submitted, to the extent that they are admissible as evidence. Disputed facts are noted. Portions of the underlying incident were recorded by Defendant Strain's body worn camera. BWC, Dkt. No. 43-10.  To the extent any party's characterization of material facts conflicts with what is "clearly show[n]" in the body worn camera footage, the Court will consider these facts effectively undisputed.  *See Crespo v. City of New York*, No. 22-cv-2693, 2025 WL 1311035, at *1 (E.D.N.Y. May 6, 2025) (citing *Scott v. Harris*, 550 U.S. 372 (2007) (when a party's version of the facts is discredited by a video recording, a court should accept the video recording on a summary judgment motion)).

[2]It is undisputed that Plaintiff lived in Apartment 10N at the North Point Apartments in Clifton Park with his girlfriend, C.B., and her two daughters, ages seven and two.

that Trooper Strain and Deputy Rooney heard a baby crying as they stood outside Plaintiff's door or that the baby stopped crying after Trooper Strain announced himself.[3]

Trooper Strain repeatedly knocked on Plaintiff's apartment door and called out to its occupants, but there was no response. Pl. Resp. County SUMF ¶¶ 423(a)-(e); Pl. Resp. Strain SUMF ¶ 11; Pl. Supp. SUMF ¶ 6; BWC at 17:34:35-17:38:35. After approximately four minutes, Trooper Strain and Deputy Roney left the building and encountered Damon Bink,[4] the 911 caller. Pl. Resp. County SUMF ¶¶ 96-97; Pl. Resp. Strain SUMF ¶¶ 14-15. Bink, who lived in Apartment 7, stated that when he came out of his apartment he heard a male and female screaming at each other. BWC at 17:39:10-17:40:15. Bink further stated that he was "honestly concerned for her safety, because they have two kids as well." *Id.* When asked if anyone from the apartment had left, Bink responded, "I saw him . . . he was just on the balcony." *Id.*

Trooper Strain went to the apartment's management office while Deputy Roney remained outside Plaintiff's apartment building with Bink. Pl. Resp. County SUMF ¶ 102; Pl. Resp. Strain SUMF ¶ 18. While Trooper Strain was gone, Bink pointed out a young girl he believed to reside in Plaintiff's apartment who was playing outside. Pl. Resp. County SUMF ¶ 103. A woman subsequently came out to Plaintiff's apartment balcony and "was screaming" at Deputy Roney to "get away from . . . her daughter . . . ." *Id.* ¶¶ 105-107. Deputy Roney remained stationed outside the apartment building. *Id.* ¶ 108.

---

[3] Specifically, in response to the statement "As Trooper Strain approached the apartment door he heard a baby crying, and knocking on the door upon announcing himself as an officer he observed that the baby went silent," Plaintiff responded, "Disputed insomuch as it claims that the baby ceased its crying as a direct result of Trooper Strain[] announcing himself as an officer." Pl. Resp. Strain SUMF ¶ 8. Furthermore, in response to the statements "[Deputy Roney] could hear a baby crying and then Trooper Strain announced himself," and "Then the baby stopped crying and [Deputy] Roney heard nothing else," Plaintiff responded, "Not disputed for purposes of this motion." Pl. Resp. County SUMF ¶¶ 87, 88.

[4] Damon Bink is also referred to as "Breanna Bink" in portions of the parties' moving papers.

Meanwhile, at the management office, Trooper Strain requested a key to access Plaintiff's apartment, stating that:

> We just had a call to apartment 10 North, Building One, and . . . there were two people fighting, we got up to the apartment, you could hear a baby crying. We knock on the door and announce ourselves and the baby went dead silent, nobody is answering the door. So, we need to get in there . . . it's either going to be if you guys want to give us a key or we're probably going to have to boot the door in.

BWC at 17:41:50-17:42:50. The apartment manager agreed to provide a key and commented that there were two apartments in Building One with "domestic issues" over the "last couple months," although he was not sure if one of them was Plaintiff's apartment. *Id.* at 17:42:50-17:43:10. Trooper Strain responded that it "could be nothing," but "you show up and you hear a baby crying, and everyone gets quiet . . . ." *Id.* at 17:43:10-17:43:25.

Trooper Strain returned to Plaintiff's apartment building with the apartment manager and met Deputy Roney outside. Deputy Roney informed Trooper Strain that he had learned that one of the children outside of the building resided in Plaintiff's apartment. Pl. Resp. County SUMF ¶¶ 103-07, 423(o). As they walked back into the apartment building, Plaintiff met them at the bottom of the interior staircase. *Id.* ¶ 109; Pl. Resp. Strain SUMF ¶ 28. Plaintiff stated that he had been asleep in his apartment. BWC at 17:44:40-17:44:50. Trooper Strain asked Plaintiff who was awake in Plaintiff's apartment, and Plaintiff replied, "You just woke me up, what's up?" *Id.* at 17:44:50-17:45:04. Plaintiff walked outside the apartment building with Deputy Roney, and Trooper Strain proceeded upstairs to Plaintiff's apartment with the apartment manager, stating that he wanted to speak with the woman inside the apartment, and still wanted "to get in" because there "should be two people in there still." *Id.*

The body worn camera footage captures the following subsequent events. Trooper Strain arrived outside Plaintiff's apartment door and knocked and rang the doorbell without response.

He subsequently took the keys from the apartment manager, announced himself as State Police, and attempted to unlock the door.  At that time, Plaintiff ascended the interior apartment building staircase.  Trooper Strain told Plaintiff that he needed to "see everyone in the apartment."  Plaintiff and Trooper Strain argued as to whether a warrant was necessary, and Trooper Strain stated that Plaintiff could either "have them come out and talk to me, which I'm perfectly fine with, or I'm going to go in and check on them.  It's up to you."  Plaintiff objected to either alternative, and Trooper Strain continued his attempt to unlock the door.  BWC at 17:45:20-17:46:30.

Trooper Strain eventually unlocked and opened Plaintiff's apartment door.  From the open doorway, Trooper Strain continued to announce himself to the apartment's occupants, asking them to come to the door and stating that he just needed to "check on you and the child, then we are out of here."  At that point, Plaintiff brushed past Trooper Strain to enter the apartment, and took up a position facing Trooper Strain inside the doorway.   Trooper Strain, now standing somewhere between the door and front vestibule of the apartment, indicated that he needed to see the other occupants.  Plaintiff continued to stand in Trooper Strain's path further into the apartment – specifically standing in front of a closed bedroom door with a broken doorknob.  Plaintiff told Trooper Strain to get out of the apartment, and refused to answer Trooper Strain's questions about who else was in the apartment.  Trooper Strain advised Plaintiff that his continued obstruction of their investigation would lead to Plaintiff's arrest.  Plaintiff continued to tell Trooper Strain to leave, and refused to move.  At that point, Trooper Strain ordered Plaintiff to put his hands behind his back, to which Plaintiff responded, "for what?"  BWC 17:46:30-17:48:52.

According to Trooper Strain, he then placed one hand on Plaintiff's left wrist, and Plaintiff resisted by pulling away from his grip.  Strain SUMF ¶ 51.  Deputy Roney grabbed Plaintiff across his biceps and upper chest in a bear hug, as both officers were trying to gain control of Plaintiff's

wrists so that Trooper Strain could apply the handcuffs and effect the arrest. *Id.* ¶ 52. Plaintiff continued to resist. *Id.* ¶ 54. "With Trooper Strain still holding onto Plaintiff's wrist with his hand, Deputy Roney, Trooper Strain, and Plaintiff started to fall out of the apartment into the landing" as they attempted to move Plaintiff out. *Id.* ¶ 55. Trooper Strain's grip on Plaintiff's wrist broke free as Plaintiff was pulling away from him, and Plaintiff and Deputy Roney "went over." *Id.* ¶ 56. "With Deputy Roney's arms still wrapped around Plaintiff's torso, both Deputy Roney and Plaintiff . . . hit the ground." *Id.* ¶ 57. Neither Trooper Strain nor Deputy Roney had complete control over Plaintiff until Plaintiff broke Trooper Strain's grip and fell to the ground with Deputy Roney. *Id.* ¶ 60. Deputy Roney's account of their attempt to place Plaintiff into handcuffs is substantially the same as that of Trooper Strain. Pl. Resp. County SUMF ¶¶ 136-46.

In contrast, Plaintiff maintains that he complied with Trooper Strain's instruction to put his hands behind his back. Dkt. No. 43-7 at 118. He further testified to being "99.9%" sure that he was fully handcuffed before being "picked up" and "dropped" to the ground. *Id.* at 32, 34, 134. Specifically, Plaintiff testified that Trooper Strain grabbed his arm and twisted, Deputy Roney wrapped his arms around Plaintiff from behind, and then Plaintiff was body slammed. *Id.* at 135. According to Plaintiff, it was "all one quick motion." *Id.* at 33.

Plaintiff fell to the ground as he pulled away from the officers, with Deputy Roney falling with him. The body worn camera footage does not clearly depict the entirety of these events, but Plaintiff can be seen not complying with Trooper Strain's initial directive to put his hands behind his back, stating, "I'm not getting arrested," and yelling, "Don't fucking touch me." BWC at 17:48:50-17:49:05; Pl. Resp. County SUMF ¶ 423(zz).[5] It is also evident that Plaintiff was not

---

[5] Plaintiff does not specifically dispute that he made this statement immediately prior to being arrested, but generally disputes, without citation to the record, that there were exigent circumstances to enter the apartment without a warrant, and that officers had probable cause to

fully handcuffed until after Plaintiff and Deputy Roney were on the ground. BWC at 17:48:50-17:49:05.

After the handcuffs were applied to Plaintiff's wrists, Deputy Roney restrained Plaintiff on the ground as Trooper Strain attempted to communicate with C.B., who had made herself known inside the apartment and was yelling at the officers. At one point Trooper Strain returned to Plaintiff to hold down his legs, until leaving in an attempt to further engage with C.B. At that time, Deputy Roney kneeled over Plaintiff with one leg in front of him and one leg behind him, as Plaintiff lay on his side. While restrained on the ground, Plaintiff was yelling at the officers and complaining of injury. BWC 17:49:18-17:50:55.

Defendant Saratoga County Sheriff Deputy Paul Pecor (Deputy Pecor) subsequently arrived, having been dispatched as an additional backup unit. Pl. Resp. County SUMF ¶¶ 173-74. He observed Deputy Roney on the ground with Plaintiff on the landing outside Plaintiff's apartment. *Id.* ¶¶ 179-80. According to Deputy Pecor, he approached Plaintiff and placed his foot on Plaintiff's lower extremity to keep him from flailing around. County SUMF ¶ 182. This "empty-hand restraint technique" kept Deputy Pecor "in a position of tactical advantage because he did not know what was going on with Trooper Strain and in the apartment[.]" *Id.* ¶¶ 185, 187-88. According to Plaintiff, Deputy Pecor "slammed his booted foot on Plaintiff's left foot, causing him substantial pain." Pl. Supp. SUMF ¶ 37. Plaintiff can be heard in the body worn camera footage yelling, "why are you stepping on my toe?" BWC at 17:50:50-17:51:00. It is undisputed that Deputy Pecor removed his foot after no more than 22 seconds, Pl. Resp. County SUMF ¶ 423(sss); BWC at 17:50:53-17:51:30, at which time Deputies Roney and Pecor brought Plaintiff

---

arrest him. Accordingly, and to the extent it is not completely captured in the body worn camera video footage, the fact that Plaintiff stated "I'm not getting arrested" is deemed admitted for purposes of this motion.

to his feet and walked him downstairs, Pl. Resp. County SUMF ¶ 203.  Plaintiff was able to walk down the stairs without assistance.  Pl. Resp. County SUMF ¶ 47.  He was transported to the hospital, where he was diagnosed with a broken collarbone.  *Id.* ¶¶ 48-50.

After the hospital, Plaintiff went to the State Police barracks where he was given an appearance ticket charging him with Obstructing Governmental Administration and Resisting Arrest.  Pl. Resp. County SUMF ¶¶ 69-71.  In subsequent court proceedings, the charges were adjourned in contemplation of dismissal and ultimately "dropped."  *Id.* ¶ 73.

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an

essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV.    DISCUSSION

### A.    Official Capacity Claims

Plaintiff asserts claims for damages against the Defendants in both their individual and official capacities. *See generally* Compl. Trooper Strain argues that Plaintiff's official-capacity claims should be dismissed based on Eleventh Amendment immunity. State Memorandum of Law (Strain MOL) at 24, Dkt. No. 43-1. In response, and for the reasons stated in Trooper Strain's motion papers, Plaintiff has agreed to voluntarily withdraw the claims against "defendants in their official capacities." Plaintiff Memorandum of Law (Pl. MOL) at 34, Dkt. No. 49-1. The parties are correct that Eleventh Amendment immunity bars Plaintiff's § 1983 claim for damages against Trooper Strain in his official capacity. *See Cox v. (DOCCS) NYS Dep't of Corrs.*, 673 F. Supp. 3d 174, 184 (N.D.N.Y. 2023) ("The Eleventh Amendment also bars suits for damages against state officials acting in their official capacities.") (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). Accordingly, Trooper Strain's uncontested motion for summary judgment dismissing the Complaint as against him in his official capacity is granted.

It is unclear whether Plaintiff intended to voluntarily withdraw the official-capacity claims against Deputies Roney and Pecor. *See* Pl. MOL at 34. Plaintiff's claims against these defendants in their official capacities are essentially claims against the entity that employs them – in this case, Saratoga County. *See Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 250–51 (N.D.N.Y. 2014) (finding excessive force claims made against Schenectady police officers in their official capacities were essentially *Monell* claims against City of Schenectady). The Eleventh Amendment does not apply to bar actions against a county or municipal entity in a federal court. *See Hamad v. Nassau Cnty. Med. Ctr.*, 191 F. Supp. 2d 286, 305 (E.D.N.Y. 2000) ("[I]t is well established that Eleventh Amendment immunity applies only to the states, and not to counties and similar municipal corporations.") (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274,

280 (1977) ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations.") (internal and external citations omitted)). Thus, Plaintiff's voluntary dismissal of the official-capacity claims against Deputies Roney and Pecor is not properly based on the Eleventh Amendment immunity arguments raised by Trooper Strain.

Nevertheless, even if Plaintiff's voluntary dismissal of these claims is in error, they are otherwise subject to dismissal. The Complaint fails to allege facts suggesting an unconstitutional policy or custom, or failure to train, that would allow even a plausible inference of liability against Saratoga County under *Monell*. *See generally* Compl. Furthermore, to the extent this Court finds that no genuine issue of material fact exists as to whether these Defendants violated Plaintiff's constitutional rights, Plaintiff cannot proceed on any derivative *Monell* claim. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."). In other words, there can be no municipal liability against Saratoga County absent an underlying constitutional violation by the arresting officers in this case. For all of these reasons, the official-capacity claims against Deputies Pecor and Roney are dismissed.

**B.    False Arrest**

Plaintiff claims that he was falsely arrested by the Defendants. *See* Compl. ¶¶ 33-36. Defendants argue that summary judgment is warranted on Plaintiff's false arrest claim, because probable cause existed to arrest Plaintiff for obstructing governmental administration and resisting arrest. Strain MOL at 11-22; County Memorandum of Law (County MOL) at 14-35. Defendants alternatively argue that, at a minimum, they had arguable probable cause to arrest Plaintiff and are

therefore entitled to the protections of qualified immunity.  Plaintiff argues that his arrest, which was predicated upon the Defendants' unlawful entry into his apartment, was not supported by probable cause and violated his constitutional rights as a matter of law.  Pl. MOL at 11-25.

False arrest claims under § 1983 are analyzed under the law of the state in which the arrest occurred.  *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).  The elements of a false arrest claim in New York are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

An officer has probable cause when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly*, 439 F.3d at 152. To determine the existence of probable cause, a court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).  The significance of each of these factors may be enhanced or diminished by surrounding circumstances.  *Guan v. City of N.Y.*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).  The court should look to "the totality of the circumstances" and "must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (quoting *Caldarola*, 298 F.3d at 162).  "On summary judgment, the existence of probable cause or arguable

cause may be determined as a matter of law where 'there is no dispute as to the pertinent events and the knowledge of the officers.'" *Shaheed v. City of New York*, 287 F. Supp. 3d 438, 449 (S.D.N.Y. 2018) (quoting *Weyant*, 101 F.3d at 852).

Here, Plaintiff's false arrest claim turns on whether the facts known by the arresting officers at the time of the arrest objectively provided probable cause to arrest Plaintiff for obstructing governmental administration [OGA], N.Y. Penal Law § 195.05, and resisting arrest, *id.* §205.30. As to the former, section 195.05 of the New York Penal Law provides, in relevant part, that:

> A person is guilty of obstructing governmental administration when [he] intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act[.]

"Accordingly, the elements of the crime are: (1) intent; (2) preventing or attempting to prevent the performance of an official function; by (3) intimidation, physical force, or interference." *Shaheed*, 287 F. Supp. 3d at 449 (citing *People v. Stumpp*, 493 N.Y.S.2d 679, 680 (N.Y. Dist. Ct. 1985), *aff'd*, 505 N.Y.S.2d 758 (N.Y. App. Term. 1986)). Furthermore, "[o]fficers must be engaged in lawful conduct to arrest a defendant for [OGA]." *Thompson v. Clark*, No. 14-cv-7349, 2018 WL 3128975, at *14 (E.D.N.Y. June 26, 2018) (citing *People v. Sumter*, 151 A.D.3d 556, 557 (N.Y. App. Div. 2017) ("[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct.")). As is relevant in this case, where a plaintiff is arrested inside his home for obstructing governmental administration, "[i]f [the officers] were not lawfully able to enter the home, then plaintiff committed no crime by obstructing their path." *Id.* (citing *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995)).

The parties in this matter contest whether the Defendants' entry into Plaintiff's apartment was lawful. Because Defendants lacked a warrant and did not secure Plaintiff's consent, they must show that "exigent circumstances" justified their entry. "Under the 'emergency aid' exception, . . . officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Soller v. Boudreux*, No. 12-cv-0167, 2015 WL 500492, at *12 (E.D.N.Y. Feb. 3, 2015) (quoting *Kentucky v. King,* 563 U.S. 452, 452 (2011) (quotations and citation omitted)); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."); *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) ("[P]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." (quotations and citation omitted)). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009); *see also Stuart*, 547 U.S. at 404 ("The officer's subjective motivation is irrelevant."). "It requires only an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid[,]" *Fisher*, 558 U.S. at 47 (cleaned up), i.e., "that medical assistance was needed, or persons were in danger," *id.*; *see also Alexander v. City of Syracuse,* 132 F.4th 129, 147 (2d Cir. 2025) ("'The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or to take action' without securing a warrant.") (citation omitted).

"Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception[,]" *Fisher*, 558 U.S. at 49 (quotations omitted), and the court must

refrain from "replac[ing] th[e] objective inquiry into appearances with [a] hindsight determination that there was in fact no emergency," *id*.; *see also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation . . . . reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .") (quotations and citation omitted).

"Moreover, 'the combustible nature of domestic disputes' requires that courts 'accord[ ] great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.'" *Crespo v. City of New York*, No. 22-cv-2693, 2025 WL 1311035, at *3 (E.D.N.Y. May 6, 2025) (quoting *Tierney*, 133 F.3d at 197); *see also Patrizio v. Nelson*, No. 14-cv-7497, 2016 WL 3582047, at *11 (E.D.N.Y. June 28, 2016) ("It is not in the public interest for officers to delay investigating domestic violence reports for fear of civil liability when a resident refuses to open the door."). Still, warrantless entry is unconstitutional when "there [is] no emergency," even if officers have probable cause to suspect that a domestic dispute occurred. *See Penree by Penree v. City of Utica, N.Y.*, 694 F. App'x 30, 33 (2d Cir. 2017).

Viewing the facts in the light most favorable to Plaintiff, the Court finds that at the time Trooper Strain and Deputy Roney entered Plaintiff's apartment, emergency circumstances existed presenting an objectively reasonable basis for the Defendants to believe that entry into Plaintiff's apartment vestibule was necessary – at the very least, to ensure the safety of the baby they believed to be in the apartment. Trooper Strain and Deputy Roney were responding to a 911 call reporting a physical domestic dispute. When the officers arrived at Plaintiff's apartment, it is undisputed that they heard a baby crying, and after they announced themselves at the door the baby "went

silent." After unsuccessful efforts to communicate with the occupants of the apartment, Trooper Strain and Deputy Roney spoke with the 911 caller, who expressed a concern for the safety of C.B. and her children based on what he had heard. Notably, the 911 caller also conveyed that he had only seen Plaintiff since calling 911, but had not seen C.B. or the baby. Trooper Strain and the officers also learned from the 911 caller that C.B.'s older child was outside, apparently unattended, with a group of older children. C.B. had appeared briefly on the apartment balcony yelling at Deputy Roney, but there was no indication that the baby was with her. When Plaintiff eventually confronted Trooper Strain and Deputy Roney outside the apartment, he refused to provide information about who was in the apartment or their status, and declined the officers' request that Plaintiff have the occupants of the apartment come out to talk to them. On these undisputed facts, Trooper Strain and Deputy Roney had an objectively reasonable basis for believing that C.B.'s baby, who had yet to be seen by the officers, had been harmed or was otherwise in danger.

To be sure, an officer's subjective concern for a child's wellbeing is not, by itself, sufficient to create exigent circumstances for purposes of a warrantless entry. *See Rattray v. City of N.Y.*, No. 17-cv-8560, 2022 U.S. Dist. LEXIS 166312, at *13-14 (S.D.N.Y. Sep. 14, 2022), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 55952 (S.D.N.Y. Mar. 30, 2023) ("Subjective concern for a child's wellbeing without any objective evidence supporting the concern is . . . generally not sufficient to establish exigent circumstances, because an 'officer's subjective belief as to whether exigent circumstances existed . . . is not relevant.'") (citing, among others, *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (explaining that the court would not consider the officers' subjective concern for children whom they believed were home alone, because subjective belief is not relevant in the Fourth Amendment context)). Nevertheless, cases declining to find exigent circumstances justifying a warrantless entry in this context are factually distinguishable from this

case. *Cf. Penree,* 694 F. App'x at 33 (no exigent circumstances where officers were responding to a domestic violence incident but "could see that the children were not in danger or in need of aid."); *Rattray,* 2022 U.S. Dist. LEXIS 166312, at *13-14 (no exigent circumstances despite officers' concern for child inside apartment where defendants were not informed of any concerns regarding or risk to the child's safety, and officers were not aware if child was even home, let alone in need of assistance); *Hurlman v. Rice,* 927 F.2d 74 (2d Cir. 1991) (no exigent circumstances to enter home to retrieve child residing with an individual convicted of endangering the welfare of a child, where lack of knowledge regarding whether any threat to child "was imminent or of emergency proportions" specifically on the night in question). Here, in contrast, the officers were responding to an active domestic dispute that was corroborated by the 911-caller who expressed safety concerns for the children and their mother. *See Rattray*, 2022 U.S. Dist. LEXIS 166312, at *14-15 (". . . if [the defendant officers] were in fact informed of a concern for the child's safety, this could support a finding of exigent circumstances."). Moreover, the officers themselves heard a baby in distress inside the apartment upon arrival, who became silent after the officers announced themselves. *See Magnuson v. Cassarella,* 813 F. Supp. 1321 (N.D. Ill. 1992) (exigent circumstances justified warrantless entry into house where officers were called to the scene of a domestic disturbance by a neighbor who heard screams and was concerned about the infant in the house, and officers heard screaming upon arrival).

Plaintiff argues that the "lack of urgency" displayed by Trooper Strain between the time he heard C.B.'s baby stop crying and when he entered Plaintiff's apartment vitiates the Defendants' reliance on the emergency aid exception. According to Plaintiff, had exigent circumstances been present, Trooper Strain would have taken more extreme and expedited measures to get into the apartment. This argument is unpersuasive. "[S]hort delays between an

officer's arrival at the scene of an alleged crime and the officer's entry of the premises do not necessarily negate the situation's exigency." *United States v. Sikut*, 488 F. Supp. 2d 291, 309 (W.D.N.Y. 2007) (collecting cases).[6]  "When the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny the suspicion, and then act once they have received no indication that the danger has been dissipated, the waiting period does not defeat the applicable exception to the warrant rule." *Id.* (quoting *United States v. Jones*, 635 F.2d 1357, 1361 (8th Cir. 1980)).  Here, in the approximately twelve minutes between when Trooper Strain heard the baby stop crying and when he entered the apartment, it is undisputed that the officers took additional investigatory steps to determine whether exigent circumstances were objectively present.[7]  As previously described, the results of their investigation failed to dissipate the reasonable suspicion that there was a baby in the apartment that was in danger or required aid.

Because the officers had a lawful basis to enter the apartment under the emergency aid exception, the false arrest analysis turns on whether probable cause otherwise existed to arrest Plaintiff for OGA.  As previously determined, the officers had a lawful basis for entering the apartment to check on the welfare of its occupants, and were therefore performing an "official

---

[6] *See United States v. Najar*, 451 F.3d 710 (10th Cir. 2006) (thirty minute delay "caused by reasonable investigation into the situation facing the officer" did not preclude finding exigent circumstances); *United States v. De Jesus–Batres*, 410 F.3d 154, 159 (5th Cir. 2005) (45 minute delay not dispositive on the presence of exigent circumstances); *United States v. Jones*, 635 F.2d 1357 (8th Cir. 1980) (one hour delay does not negate existence of exigent circumstances); *United States v. Picariello*, 568 F.2d 222 (1st Cir.1978) (exigent circumstances present despite six hour delay).

[7] Indeed, Plaintiff's argument is undermined to the extent he states that the officers should have taken *more* time to "make inquiry of [Plaintiff] to assess whether in fact any exigency existed." Pl. MOL at 16.  The record reflects that the officers did ask Plaintiff about the status of the apartment's occupants and Plaintiff provided non-answers.  Thus, Plaintiff cannot reasonably fault the officers for the time they took to interview Bink prior to their entry.

function" under the OGA statute. Plaintiff argues that his conduct – "[standing] in the same spot inside his apartment, refus[ing] to answer Trooper Strain's questions, and repeatedly ask[ing] the officers to get out of his house because they did not have a warrant to enter" – did not constitute "physical interference" sufficient to support a charge of OGA. Pl. MOL at 24. However, it is clear that the physical component of an OGA charge "is satisfied when an individual intrudes himself into, or gets in the way of, an ongoing police activity." *Scott v. City of New York*, No. 16-cv-834, 2020 WL 208915, at *6 (E.D.N.Y. Jan. 14, 2020) (quoting *Kass v. City of New York*, 864 F. 3d 200, 210 (2d Cir. 2017)). It is undisputed that once Trooper Strain opened the apartment door, Plaintiff brushed past him to get inside. Plaintiff then turned around and took a stance facing Trooper Strain in the vestibule, preventing his further entry into the apartment bedroom, and impeding his investigation into the welfare of its occupants. Plaintiff continued to argue with Trooper Strain, telling him to get out. On this record, Plaintiff's conduct satisfies the physical interference requirements for obstruction.

Plaintiff also argues that he lacked the criminal intent required to interfere with the officers' investigation. Pl. MOL at 25. Trooper Strain repeatedly informed Plaintiff that his intent was to check on the welfare of the occupants of the apartment, and gave Plaintiff the option of producing C.B. and the baby so he could ensure they were not in danger or injured. Trooper Strain also informed Plaintiff that his continued obstruction into this investigation would lead to an arrest for OGA. Nevertheless, Plaintiff affirmatively moved himself into Trooper Strain's path, continued to block Trooper Strain's path to assess the status of C.B. and the baby, and argued with Trooper Strain about his entry. Given the "great latitude" afforded to officers in determining intent to obstruct, *see Fana*, 2018 WL 1581680, at *9, it was reasonable for the officers to infer Plaintiff's intent to obstruct their investigation, *see Kass*, 864 F.3d at 210 ("We think that it was reasonable

for the officers to infer that, based on [plaintiff's] repeated refusals to move, he intended to interfere with their efforts"); *see also Santiago v. City of Rochester*, No. 19-cv-6860, 2024 WL 4289600, at *8 (W.D.N.Y. Sept. 25, 2024) (reasonable for officers to infer plaintiff's intent to obstruct their investigation where she "refused to obey the order, remained in place, and continued to interject and talk over the officers as they attempted to get [a witness's] statement."). Accordingly, probable cause to arrest Plaintiff for obstructing governmental administration existed, and summary judgment is granted for Defendants as to Plaintiff's false arrest claim on this basis.

Plaintiff was also arrested for resisting arrest. The Second Circuit has made clear that under New York law, there must be probable cause to arrest someone for an independent crime apart from "resisting arrest" to defeat a false arrest claim. *Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003). Under New York law, "'[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person.'" *Id.* (quoting N.Y. Penal Law § 205.30). It is "well established in New York that probable cause to arrest is a prerequisite for making an authorized arrest, and if there is no probable cause to arrest a person, that person cannot be guilty of resisting arrest." *Id.* (quotation marks and citation omitted). Courts have applied this law in the OGA and resisting arrest context. *See McKnight v. Vasile*, No. 11-cv-6328, 2017 WL 1176051, at *20 (W.D.N.Y. Mar. 30, 2017) (finding that a lack of probable cause to arrest for OGA "compels the determination that [the officer] likewise lacked probable cause to arrest . . . for resisting arrest." (citing, among others, *Curry*, 416 F.3d at 336)); *Dancy v. McGinley*, 843 F.3d 93, 113 n.17 (2d Cir. 2016) ("Because there was no arguable probable cause to arrest . . . for [OGA], there was also no probable cause to arrest for resisting that arrest." (emphasis in original)).

Here, the Court need not make a finding as to whether the officers had probable cause to arrest Plaintiff for resisting arrest for purpose of this motion, but if such a finding were necessary, then the Court would agree that probable cause also existed to arrest Plaintiff for resisting arrest. Specifically, Plaintiff's conduct, including pulling away from the defendant officers, preventing them from applying wrist restraints, combined with his verbal statements made during the arrest, provided a reasonable basis for the officers to believe that Plaintiff was attempting to prevent his arrest for OGA. *See Smith v. City of New York*, No. 1:18-cv-05079, 2021 WL 4267525, at *12 (S.D.N.Y. Sept. 20, 2021) (in malicious prosecution context, finding probable cause for resisting arrest where Plaintiff "flail[ed]" and "tensed his arms and resisted to be placed in handcuffs."); *Benny v. City of Long Beach*, No. 20-cv-1908, 2022 WL 2967810, at *16 (E.D.N.Y. July 27, 2022), *aff'd*, No. 22-1863, 2023 WL 8642853 (2d Cir. Dec. 14, 2023) (probable cause existed to arrest plaintiff for resisting arrest where Plaintiff, after being told he was under arrest, "turn[s] around, he spins and tries to break free of the Defendant officer's initial attempt to arrest him . . . ." then engages in a subsequent "scuffle" with the arresting officers as they attempt to place him in restraints.")

Alternatively, because Defendants had, at the very least, arguable probable cause to arrest Plaintiff, they are entitled to summary judgment based on the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the

law.'" *Kass*, 864 F.3d at 206 (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)).

"[I]n the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with arguable probable cause[.]" *Schlaepfer v. City of New York*, No. 20-cv-3339, 2022 WL 4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks and citation omitted); *see also Kass*, 864 F.3d at 206 ("An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-cv-8863, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

Here, for the reasons previously discussed, even if the officers were not lawfully present in Plaintiff's apartment, it was objectively reasonable for them to believe that they were.  It was furthermore objectively reasonable for the officers to believe that Plaintiff was intentionally obstructing the officers' ability to perform an official function, i.e. determine the welfare of the child within the apartment who had not been heard, or seen, since they arrived in response to the domestic dispute and announced their presence. Accordingly, the defendants are alternatively entitled to summary judgment on Plaintiff's claim for false arrest.  *See Crespo*, No. 22-cv-2693, 2025 WL 1311035, at *7 (E.D.N.Y. May 6, 2025) (finding that although the defendant officers entered a house unlawfully and subsequently arrested Plaintiff for OGA, "competent officers could conclude that the warrantless entry was justified . . . . [thus] defendants were entitled to qualified

immunity because there was at least "reasonably trustworthy information sufficient to warrant the conclusion that [Plaintiffs] were obstructing a lawful arrest[.]").

C.    **Excessive Force**

Plaintiff claims that Defendants used excessive force against Plaintiff in the course of his arrest. *Compl.* ¶¶ 29-32. Defendants seek summary judgment on this claim, arguing that their use of force was objectively reasonable under the circumstances confronting them at the time. Strain MOL at 22-24; County MOL at 35-41. The County Defendants alternatively argue that they are entitled to qualified immunity on the excessive force claim. County MOL at 41-42. Plaintiff argues that the Defendants' use of force was not only unlawful due to the baseless entry into Plaintiff's apartment leading to his arrest for OGA, but also argues that the use of force was excessive as a matter of law even assuming that the entry into Plaintiff's home was lawful. Pl. MOL at 28-35.

The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether the force used by an arresting officer was excessive is determined by an objective balancing test where "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests" is balanced "against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

At least three factors guide the determination: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. "The 'reasonableness' of a particular use of force must be judged from the perspective

23

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97. "Such calculus accounts for the well-worn axiom that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *White v. LaRusch,* No. 18-cv-1245, 2022 WL 4287661, at *9 (W.D.N.Y. June 1, 2022), *report and recommendation adopted*, 2022 WL 3655184 (W.D.N.Y. Aug. 25, 2022) (quoting *Graham,* 490 U.S. at 396) (quotations omitted)). "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

### 1.    Trooper Strain and Deputy Roney

Plaintiff's excessive force claim against Trooper Strain and Deputy Roney is based on their conduct in taking Plaintiff to the ground. As an initial matter and as discussed above, Trooper Strain and Deputy Roney's use of force was not unjustified for lack of a basis to detain Plaintiff, because the officers had at least arguable probable cause to arrest him. "It is well-settled that 'the right to make a lawful arrest carries with it the right to use reasonable force to effectuate that arrest.'" *Lin v. County of Monroe*, 66 F. Supp. 3d 341, 358 (W.D.N.Y. 2014). Still, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000).

Here, summary judgment for Defendants is warranted on Plaintiff's excessive force claim against Trooper Stain and Deputy Roney because, even viewing the facts in the light most

favorable to the Plaintiff, no reasonable jury could find that the officers' conduct was objectively unreasonable. As to the first factor, the crime for which Plaintiff was being arrested for, Obstructing Governmental Administration, "is not an insubstantial crime," *DiGennaro v. Town of Gates Police Dep't*, No. 07-cv-6426, 2013 WL 3097066, at *13 (W.D.N.Y. June 18, 2013), however it does not rise to the level of a violent felony for which more weight might be afforded under this factor. Nevertheless, consideration of the second and third factor of the analysis weigh more substantially in favor of the Defendants. Viewing the totality of the circumstances, Plaintiff was committing this crime by actively obstructing and interfering with the officer's investigation into the welfare of C.B.'s baby, whose status had not been ascertained since the reported domestic dispute and perceived distress from outside the apartment door. Considering Plaintiff's conduct, including blocking the apartment bedroom door and deflecting the officer's inquiries into the welfare of the baby, it was not unreasonable for the officers to believe that Plaintiff's was attempting to prevent them from providing assistance to the baby. Furthermore, the parties do not dispute the evidence showing that Plaintiff was resisting the officers' attempts to place him under arrest.

It is Plaintiff's position that he was handcuffed behind his back prior to being "picked up" and "dropped" to the ground. However, Plaintiff's testimony is undermined by the body worn camera footage showing that the defendant officers were unable to place handcuffs on him until they had taken him to the ground, and even then Plaintiff continued to resist the placement of his handcuffs. As soon as Plaintiff was successfully handcuffed, the use of force ended. Accordingly, the Court finds no genuine dispute of material fact as to these issues.

At most, the parties dispute whether Deputy Roney and Trooper Strain "fell" to the ground with Plaintiff due to a lack of control, or grabbed Plaintiff and slammed him to the ground.

Defendants contend that the force with which Plaintiff was taken to the ground, and the manner in which Deputy Roney landed on him, was due in part to their lack of control over Plaintiff, who was resisting them, and the minimal space in which they were attempting to effectuate the arrest. Plaintiff describes the use of force as excessive to the extent he was "dropped" to the ground, or "body slammed." He does not specifically dispute that the Defendants struggled to take control of him during the takedown, but testified that it was a "fast-moving event."

Whether the Defendants fell with Plaintiff or body-slammed him to the ground does not create a triable issue of material fact precluding summary judgment in this case. As the body camera footage substantiates, after Trooper Strain grabbed Plaintiff's wrist, Plaintiff pulled himself away and further into the apartment. The two officers attempted to gain control of Plaintiff's arms, as Plaintiff made statements to them that can only be construed as continued resistance. Courts in this Circuit have found officers' use of force to effectuate an arrest justified when a suspect is resisting arrest by contorting their body or otherwise making it difficult to handcuff them. In these cases, the physical efforts by arresting officers in line with, or exceeding, those of Trooper Strain and Deputy Roney have been considered objectively reasonable as a matter of law. *See Tracy*, 623 F.3d at 98 ("[g]iven that [plaintiff] was clearly resisting arrest at that point, it was not unreasonable for [defendant] to respond by diving on top of [plaintiff] and pinning him down so that he could not get back up and continue to flee"); *Kalfus v. N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458, 472–73 (S.D.N.Y. 2010) (finding that the video of plaintiff's arrest for trespass showed that the plaintiff was "clearly resisting" as he refused to stand and "clearly pushed back with his weight" when officers put him face down on a concrete slab to handcuff him and, thus, the officers used "only objectively reasonable force under the circumstances"), *aff'd*, 476 F. App'x 877 (2d Cir. 2012); *LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing

allegations that "two officers tackled [plaintiff], rolled her on the floor, threw her against the walls, and then dragged her out of the room" because "the admitted facts establish that LaFever acted aggressively during the entirety of the police encounter and continuously physically resisted the officers' attempts to arrest her"); *McKenzie v. City of New York*, No. 18-cv-6913, 2021 WL 3375613, at *4-5 (S.D.N.Y. Feb. 26, 2021) (finding it objectively reasonable for police officer to "slam" the plaintiff to the stairs after the plaintiff, who was stopped for a misdemeanor sex offense, ran from officers attempting to evade arrest).

Plaintiff argues that his resistance "was, at most, the refusal to permit the easy application of handcuffs." Pl. MOL at 30. Citing to the Second Circuit's decision in *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015), Plaintiff contends that his minimal resistance did not authorize Trooper Strain and Deputy Roney to use substantial force in grabbing plaintiff and slamming him into the ground to accomplish the handcuffing. In *Brown,* the Second Circuit concluded that the plaintiff's evidence as to excessive force was sufficient to survive a motion for summary judgment, where a young woman who was resisting an arrest for disorderly conduct was taken to the ground and sprayed in the face with pepper spray. However, this case is distinguishable from *Brown* in many aspects. At the outset, the force at issue in *Brown* included the arguably gratuitous use of pepper spray, which is not a consideration here. Furthermore, Brown's crimes amounted to a few traffic violations, and Brown posed no threat to the safety of others. Here, in contrast, the officers were confronted with a corroborated report of a domestic dispute, and attempting to ascertain the welfare of the parties involved. Plaintiff, who was known to have been involved in the domestic dispute, was actively obstructing the officers' ability to ascertain the welfare of C.B.'s baby.

The *Brown* court also emphasized that summary judgment was not appropriate in *Brown* because the jury's assessment was needed to determine why "less aggressive" means of

accomplishing the arrest were not used, specifically why each officer could not have "simply held one of her arms, brought it behind her, and put handcuffs on her wrists," or "simply surrounded her, at least for a few moments, making it clear that she could not leave until she submitted to handcuffing." *Id*. at 102-03. The officers here were not confronted with such options. Plaintiff had positioned himself in the corner of the apartment's front vestibule, where the officers were unable to surround him. When the officers attempted to hold him to place him in handcuffs, Plaintiff's ensuing resistance prevented them from doing so. Accordingly, Plaintiff's reliance on *Brown* is misplaced, and summary judgment for Trooper Strain and Deputy Roney is appropriate as to Plaintiff's excessive force claim.

Alternatively, even if Trooper Strain and Deputy Roney violated Plaintiff's constitutional right to be free from excessive force, they are shielded from liability by their qualified immunity. As previously discussed, "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Id*. at 664 (citing *al-Kidd*, 563 U.S. at 741) (quotations omitted). Controlling authority serves to put officials on notice of what is unlawful; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

As a result, the issue presented here is whether, under clearly established law, every reasonable officer would have concluded that Trooper Strain and Deputy Roney's actions violated Plaintiff's Fourth Amendment rights in the particular circumstances presented by the uncontested facts and the facts presumed in Plaintiff's favor. Here, those circumstances involved a person

obstructing officers' investigation into the welfare of C.B.'s baby after a reported domestic dispute, and subsequently resisting the officers efforts to apply handcuffs to accomplish an arrest grounded in the obstruction, resulting in those officers forcibly taking him to the ground to effect the arrest.

Plaintiff has not provided any decisions of the Supreme Court or the Second Circuit that "clearly establish" that the actions of Trooper Strain and Deputy Roney, viewed in the circumstances in which they were taken, were in violation of the Fourth Amendment, nor is the Court aware of any such precedent. It is of some import, however, to note that the *Brown* case on which Plaintiff relies was back before the Second Circuit two years later, on appeal of the award of summary judgment to the officer-defendants based on the doctrine of qualified immunity. *See Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017). The Second Circuit upheld the decision to apply qualified immunity, relying in part on the lack of clearly established caselaw as to excessive force under those circumstances, including the refusal to comply with officers' instructions and resistance to arrest. As previously discussed, the degree of force used by the officers in *Brown* exceeded that in this case, and Plaintiff's conduct here implicated safety concerns not present in *Brown.* Thus, to the extent the Second Circuit found qualified immunity appropriate under those circumstances, and in the absence of any intervening caselaw suggesting clearly established law as to this issue, Trooper Strain and Deputy Roney are alternatively entitled to qualified immunity. *See Harris v. Leon,* No. 20 Civ. 10864, 2023 WL 2051171, at *7 (S.D.N.Y. Feb. 16, 2023) ("there is no clearly established law that the use of significant force against a non-compliant but non-threatening arrestee amounts to constitutionally excessive force.").

### 2. Deputy Pecor

Plaintiff's excessive force claim against Deputy Pecor is based on the placement of Deputy Pecor's foot on Plaintiff's ankle while Plaintiff was restrained on the ground. Plaintiff claims that Deputy Pecor "forcibly stomped" on Plaintiff's ankle with his "booted foot," causing Plaintiff

"substantial pain." Plaintiff's MOL at 30-31. Plaintiff did not receive any treatment for his ankle, and he did not suffer from any injury to his ankle other than "difficulties" with his ankle and foot on the day in question. County Resp. SUMF ¶¶ 52-54. Plaintiff did not have to self-treat his foot or ankle, but believed the conduct by Deputy Pecor seemed "unnecessary." *Id.* ¶ 54.

The body worn camera footage reflects that as Deputy Pecor crested the interior apartment stairs and first observed Plaintiff, Deputy Roney released hold of Plaintiff's leg, which then fell to the ground. Plaintiff was also screaming. Deputy Pecor immediately approached Plaintiff and, assuming the facts in the light most favorable to Plaintiff, "stomped" on the outside of his foot preventing his leg from further movement. Deputy Pecor maintained this stance for no more than 22 seconds, before helping Deputy Roney get Plaintiff off the ground and assisting him down the stairs. BWC at 17:50:45-12:51:30.

Plaintiff has failed to raise a triable issue of fact as to the objective reasonableness of Deputy Pecor's use of force. Although the Court, admittedly, cannot specifically quantify the amount of pressure applied by Deputy Pecor to Plaintiff's foot, the body worn camera footage does not reflect the gratuitous stomping of Plaintiff's lower extremity, but instead the forceful placement of his foot on the outside of Plaintiff's foot. Moreover, it is reasonable to infer from the Plaintiff's lack of injury that the pressure was not extreme or unreasonable under the circumstances. *See Humbach v. Canon*, No. 13-cv-2512, 2019 WL 1369464, at *7 (S.D.N.Y. Mar. 25, 2019) ("[D]e minimis injury can serve as conclusive evidence that de minimis force was used.") (citations omitted); *see also Morales v. City of New York*, No. 13-cv-7667, 2016 WL 4718189, at *4 (S.D.N.Y. Sept. 7, 2016). Accordingly, on these facts no reasonable juror could conclude that Deputy Pecor's conducted in securing Plaintiff in such a manner was objectively unreasonable where (1) he was responding to a request for back-up to assist with a reported

disturbance, (2) upon arrival to the scene he observed (a) Plaintiff restrained on the ground by Deputy Roney and (b) Plaintiff's leg moving around, and (3) could hear yelling from both Plaintiff on the ground and C.B. inside the apartment. At the very least, for the reasons previously expressed Deputy Pecor is entitled to qualified immunity shielding him from liability for his conduct.

## V. CONCLUSION

For these reasons, it is

**ORDERED,** that Defendants' motions for summary judgment, Dkt. Nos. 42, 43, are **GRANTED**, and it is further

**ORDERED,** that Plaintiff's cross-motion for summary judgment, Dkt. No. 49, is **DENIED**, and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment accordingly and close this action.

Dated: September 18, 2025

Elizabeth C. Coombe
U.S. District Judge